## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| YASMINE AKL | : |
| Plaintiff | : CIVIL ACTION |
| vs. | : |
| PENNSYLVANIA STATE POLICE TROOP K- DELAWARE COUNTY, ET. Al., | : NO. 16-CV-1096 |
| Defendants | : |

### MEMORANDUM AND ORDER

**JOYNER, J.**                                                     **February 26, 2018**

This civil action is now before this Court for disposition of the Motion of Defendants Corporal Mark D. Michaels, Trooper Carlton Jackson Wright, Jr. and Trooper Matthew Gibson for Summary Judgment. For the reasons outlined in the pages below, the Motion shall be granted.

### Case History

This civil rights action has its origins in a series of events which took place in the late afternoon and early evening hours of June 28, 2015 at Plaintiff's home in Garnet Valley, Delaware County, Pennsylvania. At approximately 4:30 p.m. on that day, Plaintiff's then-daughter-in-law, Defendant Donika Plyku, went to the Troop K Barracks of the State Police in Media, Pennsylvania with her cousin, Defendant Donald Prifti, to seek

counsel on how best to access her belongings in Plaintiff's home. Defendants Plyku and Prifti met with Defendant Troopers Matthew Gibson and Carlton Wright and informed them that, some two days earlier, Plyku had been told by her husband, Plaintiff's son Ramsey Kraya, that she was not to return to the Garnet Valley house until she signed a post-nuptial agreement.  Ms. Plyku told Troopers Gibson and Wright that she had married Kraya in August, 2014 and that she been living at the Garnet Valley residence with Plaintiff, Kraya and his adult brother and sister since December 31, 2014.  Plyku produced a Maryland driver's license with an address in Baltimore for identification, along with her marriage certificate, copies of cancelled checks made out to Ramsey Kraya in the amounts of $1,000 per month and written on or around the first of each month from January to June, 2015 for rent and household expenses.  She also showed them the post-nuptial agreement which she had been directed to sign and the keys which she had to the Plaintiff's house.  Defendant Plyku also advised Gibson and Wright that until a few days ago, she had a garage door opener which she had returned at Kraya's request since he had told her that his garage opener was not working.

In addition, Plyku told the Defendant Troopers that she had met Kraya at Johns Hopkins University in Baltimore where they both work, and she produced copies of her monthly Amtrak Trans-passes which she used to commute back and forth from Pennsylvania

to Maryland each day from January to June, 2015.  Finally, Ms. Plyku, who was approximately five months' pregnant, showed Troopers Gibson and Wright copies of the doctors' and hospital bills from Riddle Memorial Hospital, located just a few miles from the Garnet Valley home and the state police barracks and which had been sent to her at the Plaintiff's address - 4 Eavenson Way, Garnet Valley, PA.

Defendant Gibson informed Ms. Plyku that because her husband had not harmed her physically, there were no grounds for filing a petition for a protection from abuse order.  However, satisfied that Plyku resided there, Gibson advised her to go to the house and ask Plaintiff and her family for access to the residence so she could claim her belongings.  In the event that she was unable to gain access or that she was in danger of having an altercation, Gibson told Plyku to call the state police immediately.

Plyku and Prifti then left the barracks and went to the Plaintiff's house but no one answered the door and it appeared as though no one was home.  After trying to enter the house using her keys, Plyku found that the locks had been changed.  She called the state police barracks and Troopers Gibson and Wright, as well as Corporal Mark Michaels arrived at the residence a short while later.  The troopers knocked on the doors to the residence and announced their presence to no avail.

Cpl. Michaels then instructed Plyku to call Kraya and, while he did not answer initially, he did call her back a few minutes later. Plyku put the call on speaker and told Kraya she was at the house and wanted to get her belongings. Kraya insisted she was not allowed to be there and that she was not going to get her possessions, at one point asking her: "What don't you get? You're not getting in that house." Hearing this exchange, Cpl. Michaels told Kraya that he was a Pennsylvania State Trooper, that he was at the house with Plyku and that she was entitled to enter the home and collect her possessions. Cpl. Michaels asked Kraya to please come and let his wife into the residence so she could remove her belongings. At the time, Plaintiff and all three of her adult children were together at an event in Princeton, NJ. Plaintiff then got on the phone and repeatedly told Michaels that she (Plaintiff) owned the house, that Plyku did not live there, did not belong there and that she was not allowed in the house. After again asking Plaintiff to please come and let Plyku into the house and Plaintiff again insisting that Plyku was not allowed to be there, Cpl. Michaels told Plaintiff that he believed that Plyku lived there and that she was going to go in however she saw fit. As Plaintiff continued to insist that Plyku was not allowed to be there, Cpl. Michaels advised Plyku to end the call and she did so.

Following this exchange, Plyku and Prifti considered various

ways to gain entry to the house.  Eventually, they gained entry when Prifti retrieved a tire iron from his car and threw it into the sliding glass door from the rear deck, shattering the glass and activating the alarm.  Following a call from the alarm company, Plaintiff and her daughter made numerous phone calls to the barracks, to Trooper Gibson's cell phone and to the house phone where they began speaking through the answering machine imploring the police to not allow Plyku into the house and to not allow her to remove any property from the residence.  Because Plyku was unable to de-activate the alarm using the code which she had and because the alarm was quite loud, it is unclear what, if anything, the troopers heard over the answering machine.  Rather, after entering the property with Plyku's permission, Troopers Wright and Gibson did a quick walk-through of the property to make sure there was in fact no one present and then exited and waited outside on the front lawn and driveway while Prifti and Plyku collected her things.  Some 30 minutes later, everyone departed the property.

In her complaint, Plaintiff contends that the Defendant Troopers broke into her home by smashing the glass out of her patio doors with a tire iron and that they, along with Defendants Plyku and Prifti, took away a large quantity of her personal property, including cash, gold coins, computers, tablets, watches, earrings and other jewelry, coats, clothing and shoes,

pots and pans, cameras, purses, rugs, Waterford and Lenox glasses, plates and bowls, a coffee maker and shelving from her refrigerator.

Previously, this Court partially granted the State Police Defendants' Motion to Dismiss, striking the claims against all of the police defendants in their official capacity, the claims for violation of Plaintiff's 14th Amendment substantive and procedural due process and larceny claims, and the *respondeat superior* claims against Captain Raykovitch and Lt. Turk as the Commander and Station Commanding officers for Troop K. Plaintiff eventually amended her pleadings to aver causes of action against the State Police Defendants pursuant to 42 U.S.C. §1983 for unlawful search and seizure and failure to protect her property from unlawful seizure under the Fourth and Fourteenth Amendments and against Prifti and Plyku for common law conversion. By the motion which is now before us, Moving Defendants seek the entry of judgment in their favor as a matter of law on the grounds that the evidence reflects that they at all times acted properly and did not violate Plaintiff's Fourth Amendment rights and are, in any event, entitled to qualified immunity from suit.

**Standards Governing Motions for Summary Judgment**

The guiding principles for resolving motions for summary judgment are outlined in Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each
> claim or defense - or the part of each claim or defense - on

which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

In all cases, the initial burden is on the party seeking summary judgment to point to the evidence which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); United States v. Donovan, 661 F. 3d 174, 185 (3d Cir. 2011).

The court reviewing a motion for summary judgment should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Burton, supra,(citing Scheidemantle v. Slippery Rock University, State System of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006)). The line between reasonable inferences and impermissible speculation is often "thin," but is nevertheless critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F. 3d 273, 287 (3d Cir. 2014)(quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382, n.12 (3d Cir. 1990) and Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985)).

Inferences must flow directly from admissible evidence. Id. Further, an issue is genuine only if there is a sufficient

7

evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In any event, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant. Burton, supra,(quoting Jakimas v. Hoffman-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)).

### **Discussion**

*A. Alleged Fourth and Fourteenth Amendment Violations*

As previously noted, this lawsuit was filed against the Defendant Pennsylvania State Troopers pursuant to 42 U.S.C. §1983 for the purported violation of Plaintiff's right to be free from unlawful search and seizure under the Fourth and Fourteenth Amendments.[1] In particular, Section 1983 states in relevant

---

[1] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, support by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

That these and other Constitutional guarantees apply with equal force to the individual states is made manifest in the following language of the Fourteenth Amendment:

part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

Thus, because §1983 is "not itself a source of substantive rights," but rather "a method for vindicating federal rights elsewhere conferred," a federal cause of action exists under §1983 "that enables individuals to seek relief in a federal forum against those persons who, under color of state law, have denied them rights secured by the Constitution or laws of the United States." Baker v. McCollan, 443 U.S. 137, 144-145, n. 3, 99 S. Ct. 2689, 2694-2695, n. 3, 61 L. Ed.2d 433 (1979); Talley by Talley v. Trautman, Civ. A. No. 96-5190, 1997 U.S. Dist. LEXIS 3279 at *6 (E.D. Pa. March 13, 1997).

The Supreme Court has observed that "[a]t the [Fourth] Amendment's 'very core,' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 569 U.S. 1, 6, 133 S. Ct. 1409, 1414, 185 L. Ed.2d 495 (2013)(quoting *inter alia*,

---

... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

United States v. Jones, 565 U.S. 400, 406-407, n. 3, 132 S. Ct. 945, 181 L. Ed.2d 911, 919 (2012) and Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed.2d 734 (1961)). Thus, a "search" within the Fourth Amendment occurs "[w]hen the Government obtains information by physically intruding on persons, houses, papers or effects." Id. However, "[a] trespass on 'houses' or 'effects' ... is not alone a search unless it is done to obtain information, and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy." Jones, 565 U.S. at 402, n. 5, 132 S. Ct. at 948, n. 5. Moreover, "[t]he Fourth Amendment prohibits only *unreasonable* searches." Grady v. North Carolina, 135 S. Ct. 1368, 1371. 191 L. Ed.2d 459, 462 (2015). The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. Id.

"A 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" Soldal v. Cook County, Ill., 506 U.S. 56, 61, 113 S. Ct. 538, 543, 121 L. Ed.2d 450 (1992)(quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed.2d 85 (1984)). And, like searches, the Amendment protects the people only from those seizures which are unreasonable.

10

Jacobsen, 466 U.S. at 120-121, 104 S. Ct. at 1660. "To be reasonable is not to be perfect and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" Heien v. North Carolina, 135 S. Ct. 530, 536, 190 L. Ed.2d 475 (2014)(quoting Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)). In keeping with this analysis, the Supreme Court has recognized that searches and seizures based on mistakes of law and fact can be reasonable. Id.

In the case now before us, the record clearly reflects that the defendant troopers neither searched Plaintiff's residence nor seized any property from the home. Rather, Moving Defendants only entered the house with the permission of Defendant Donika Plyku, who had presented evidence that she was a resident there. Defendants' entry and presence in the residence was brief and only for the purposes of confirming that in fact, no one else was home at the time. No information was sought nor obtained by any of the moving defendants from the Plaintiff's property, who spent the majority of their time at the scene waiting in the driveway and front yard of the property for Plyku and Prifti to gather and remove Plyku's belongings. Based upon this evidence, we simply cannot find that either Cpl. Michaels, Trooper Gibson or Trooper Wright violated Plaintiff's constitutional rights. Summary

Judgment is therefore properly entered in Defendants' favor as a matter of law.

   B.  *Qualified Immunity*

We additionally find that even if the actions of the Pennsylvania State Trooper Defendants in this case were somehow violative of Plaintiff's rights under the U.S. Constitution, they are nevertheless immune from suit under the doctrine of qualified immunity.

"Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" Plumhoff v. Rickard, 134 S. Ct. 2012, 2019, 188 L. Ed.2d 1056 (2014)(quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009)). Under it, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2728, 2738, 73 L. Ed.2d 396 (1982)). In other words, an official sued under §1983 is entitled to qualified immunity in the absence of a showing that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." Plumhoff, 134 S. Ct. at 2023 (citing Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2077, 179 L.

Ed.2d 1149, 1153 (2011)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every reasonable official would understand that what he is doing' is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 199 L. Ed.2d 453, 467 (2018). "The 'clearly established' standard also requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him" - that is, it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id, 199 L. Ed.2d at 467-468(quoting Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001)). "Thus, law enforcement officials who 'reasonably but mistakenly' conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity." Sharrar, supra.

Here, we find that Cpl. Michaels and Troopers Wright and Gibson all reasonably believed that they were acting lawfully when they permitted Plyku and Prifti to access the residence in any way they saw fit. Indeed, Plyku provided compelling evidence that she was a resident of the house. This evidence consisted of, *inter alia*, medical bills that had been sent to her at the property, copies of cancelled checks which she wrote to Kraya to contribute to their living expenses at the property, her marriage certificate to Kraya and copies of the monthly Amtrak passes

13

which she used to commute to and from her place of employment in Baltimore.  We thus cannot find that at the time of the officers' complained-of actions, the law was 'sufficiently clear' that they would understand that what they were doing was unlawful.  Accordingly, we find that Defendants Wright, Gibson and Michaels are qualifiedly immune from suit and judgment as a matter of law is also now appropriately entered in their favor on the basis of qualified immunity.

The motion for summary judgment shall therefore be granted in its entirety in conjunction with the attached order.