# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| YASMINE AKL | : |
| Plaintiff | : CIVIL ACTION |
| vs. | : |
| PENNSYLVANIA STATE POLICE TROOP K- DELAWARE COUNTY, ET. AL., | : NO. 16-CV-1096 |
| Defendants | : |

## MEMORANDUM AND ORDER

**JOYNER, J.**                                                 **March 6, 2018**

This case is once again before this Court on Motion of Defendant Donald Prifti for Summary Judgment.[1] For the reasons which follow, the motion shall be granted.

### Factual Background

As was discussed in greater detail in our recent Memorandum and Order addressing the Pennsylvania State Troopers' Motion for Summary Judgment, this case arose out of an incident which occurred on the evening of June 28, 2015 at Plaintiff's residence located at 4 Eavenson Way in Garnet Valley, Pennsylvania. Earlier that day, Defendant Donald Prifti had received a phone

---

[1] Moving Defendant filed a Motion to Join the Motion for Summary Judgment filed by the Pennsylvania State Police Defendants - Troopers Gibson and Wright and Corporal Michaels, which we now treat as a separately-filed motion for summary judgment.

call from his cousin, Defendant Donika Plyku asking for his help in obtaining her possessions from the Plaintiff's home, where she had been living with her husband, Ramsey Kraya, Plaintiff, who is Kraya's mother and his adult brother and sister. Some two days prior, Plaintiff and Kraya had informed Plyku that she was not to return to the Garnet Valley house unless and until she had signed a post-nuptial agreement. Prifti subsequently met Plyku at the Troop K Barracks of the State Police in Media, Pennsylvania, where they spoke with Defendant Troopers Matthew Gibson and Carlton Wright.

After explaining the situation to the Troopers and producing documentary evidence verifying her identification and demonstrating her residency, Plyku asked what she could do to collect her belongings. Defendant Gibson informed Ms. Plyku that because her husband had not harmed her physically, there were no grounds for filing a petition for a protection from abuse order. However, apparently satisfied that Plyku resided at the property, Gibson advised her to go to the house and ask Plaintiff and her family for access to the residence so she could claim her belongings. In the event that she was unable to gain access or that she was in danger of having an altercation, Gibson told Plyku to call the state police immediately.

Plyku and Prifti then left the barracks and went to the Plaintiff's house. No one answered the door and it appeared as

though no one was home.  After trying to enter the house using her keys, Plyku found that the locks had been changed.  She called the state police barracks and Troopers Gibson and Wright, as well as Corporal Mark Michaels, arrived at the residence a short while later.  The troopers knocked on the doors to the residence and announced their presence but received no response.  Cpl. Michaels then instructed Plyku to call Kraya and, while he did not answer initially, he did call her back fairly quickly.  Plyku put the call on speaker and told Kraya she was at the house and wanted to get her belongings.  Kraya insisted she was not allowed to be there and that she was not going to get her possessions, at one point asking her: "What don't you get?  You're not getting in that house."  Hearing this exchange, Cpl. Michaels told Kraya that he was a Pennsylvania State Trooper, that he was at the house with Plyku and that she was entitled to enter the home and collect her possessions.  Cpl. Michaels asked Kraya to please come and let his wife into the residence so she could remove her belongings.  At the time, Plaintiff and all three of her adult children were approximately an hour away attending an event in Princeton, NJ.  Plaintiff then got on the phone and repeatedly told Michaels that she (Plaintiff) owned the house, that Plyku did not live there, did not belong there and that she was not allowed in the house.  After again asking Plaintiff to please come and let Plyku into the house and

Plaintiff again insisting that Plyku was not allowed to be there, Cpl. Michaels told Plaintiff that he believed that Plyku lived there and that she could therefore enter the home in any manner that she saw fit. As Plaintiff continued to insist that Plyku was not allowed to be there, Cpl. Michaels advised Plyku to end the call and she did so.

Following this exchange, Plyku and Prifti considered various ways to gain entry to the house. Eventually, they gained entry when Prifti retrieved a tire iron from his car and threw it into the sliding glass door from the rear deck, shattering the glass and activating the alarm. Plyku then permitted Prifti and Troopers Wright and Gibson into the residence. The Troopers did a quick walk-through of the property to make sure there was in fact no one present and then exited and waited outside on the front lawn and driveway while Prifti and Plyku collected her possessions. Some 30 minutes later, everyone departed the property.

In her Second Amended Complaint[2], Plaintiff contends that the Defendants broke into her home by smashing the glass out of her patio doors with a tire iron and that they took away a large

---

[2] Previously, this Court partially granted the State Police Defendants' Motion to Dismiss, striking the claims against all of the police defendants in their official capacity, the claims for violation of Plaintiff's 14th Amendment substantive and procedural due process and larceny claims, and the *respondeat superior* claims against Captain Raykovitch and Lt. Turk as the Commander and Station Commanding officers for Troop K. Leave to amend was granted and Plaintiff filed an Amended Complaint, which was subsequently again amended to identify the precise state troopers involved.

quantity of her personal property, including cash, gold coins, computers, tablets, watches, earrings and other jewelry, coats, clothing and shoes, pots and pans, cameras, purses, rugs, Waterford and Lenox glasses, plates and bowls, a coffee maker and shelving from her refrigerator.  By her amended pleadings, Plaintiff alleges causes of action against all of the Defendants pursuant to 42 U.S.C. §1983 for unlawful search and seizure and failure to protect her property from unlawful seizure under the Fourth and Fourteenth Amendments and against Plyku for common law conversion.  By separate Memorandum and Order, we recently granted the motion for summary judgment of the Pennsylvania State Policemen, which motion Defendant Prifti seeks to join and which we now independently address here.

**Standards for Ruling on Summary Judgment Motions**

Under Fed. R. Civ. P. 56(a), any party may move for summary judgment on any claim or defense and the Court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In all cases, the initial burden is on the party seeking summary judgment to point to the evidence which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); United States v. Donovan, 661 F. 3d 174, 185 (3d Cir. 2011).  And, the court reviewing a motion

5

for summary judgment should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Burton, supra,(citing Scheidemantle v. Slippery Rock University, State System of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006)).

It should be noted that the line between reasonable inferences and impermissible speculation is often "thin," but is nevertheless critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F. 3d 273, 287 (3d Cir. 2014)(quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382, n.12 (3d Cir. 1990) and Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985)). Inferences must flow directly from admissible evidence. Id. Further, an issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In any event, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant. Burton, supra,(quoting

Jakimas v. Hoffman-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)).

## **Discussion**

Defendant Prifti makes two arguments in support of his assertion that he is entitled to the entry of judgment in his favor. First, he claims that he can only be found to have violated the Plaintiff's constitutional rights if he were acting as an instrument or agent of the state police. He secondarily argues that if he is found to be a private actor assisting government officials, he too is entitled to qualified immunity.

It is well-settled that the purpose of §1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. Wyatt v. Cole, 504 U.S. 158, 161, 112 S. Ct. 1827, 1830, 118 L. Ed.2d 504 (1992). To accomplish this objective, §1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights "under color" of state law. And, "[a]nyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under §1983." Filarsky v. Delia, 566 U.S. 377, 383, 132 S. Ct. 1657, 1661, 182 L. Ed.2d 662, 668 (2012)(citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed.2d 482 (1982) and 42 U.S.C. §1983). Thus, §1983 can *sometimes* impose liability upon a private individual. Richardson

v. McKnight, 521 U.S. 399, 403, 117 S. Ct. 2100, 2103, 138 L. Ed.2d 540 (1997).

In addressing what "under color of state law" means, the Supreme Court has observed:

> "[p]rivate persons, jointly engaged with state officials in ... prohibited action are acting 'under color' of law for purposes of [§1983].  To act 'under color' of law does not require that the accused be an officer of the State, [i]t is enough that he is a willful participant in joint activity with the State or its agents."

Lugar, 157 U.S. at 941, 102 S. Ct. 2756(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S. Ct. 1598, 1605-1606, 26 L. Ed.2d 142 (1970)).  Stated otherwise, "[a]ction under color of state law 'requires that one liable under §1983 have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Harvey v. Plains Township Police Dep't., 635 F.3d 606, 609 (3d Cir. 2011)(quoting Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998)).  If a defendant has not acted under color of state law, there is no grounds for suit under §1983. See, Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S. Ct. 2764, 2770, 73 L. Ed.2d 418 (1982)("If the action of the respondent school is not state action, our inquiry ends"); Pennsylvania General Energy Co., LLC v. Grant Township, Civ. A. No. 14-209ERIE, 2017 U.S. Dist. LEXIS 48716 (W.D. Pa. March 31, 2017)("Generally, a private corporation does not act under color of state law and a legal claim against such a private actor under §1983 fails").

8

Moreover, what actions may be fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity." Brentwood Academy v. Tennessee Secondary School Athletic Ass'n., 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed.2d 807 (2001). To illustrate, the Supreme Court has held that a challenged activity may be state action: (1) when it results from the State's exercise of "coercive power;" (2) when the State provides "significant encouragement, either overt or covert, or when a private actor operates as a "willful participant in joint activity with the State or its agents;" (3) when a "nominally private entity" "is controlled by an 'agency of the State," when it has been "delegated a public function by the State," when it is "entwined with governmental policies," or "when government is 'entwined in its management or control." Id,(quoting, *inter alia*, Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627-628, 111 S. Ct. 2077, 114 L. Ed.2d 660 (1991); Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed.2d 534 (1982); Lugar, supra, and Evans v. Newton, 382 U.S. 296, 299, 301, 86 S. Ct. 486, 15 L. Ed.2d 373 (1966)).

On the other hand, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Messerschmidt v. Millender, 565 U.S. 535,

546, 132 S. Ct. 1235, 1244, 182 L. Ed.2d 47 (2012)(quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" Id,(quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 2081, 179 L. Ed.2d 1149, 1157 (2011)). Hence, "qualified immunity may be available to private actors under certain circumstances where they are, in effect, acting as government officials." Jefferson v. Husain, Civ. A. No. 14-2485, 2016 U.S. Dist. LEXIS 43382 at *49 (E.D. Pa. March 31, 2016)(quoting Lang v. Pa. Higher Education Assistant Agency, 610 Fed. Appx. 158, 163, n. 7 (3d Cir. 2015)).

Having now read and carefully reviewed the record evidence produced in this case, we cannot find that Defendant Prifti was a state actor or that he was acting under color of state law when he took the actions complained of on June 28, 2015. In this regard, the testimony of the State Troopers is that after interviewing Donika Plyku and reviewing the copies of the checks she gave to her husband, the medical bills addressed to her at the Garnet Valley address, her monthly Amtrak transpasses, and her marriage certificate, they believed that she resided at the Plaintiff's house. After listening to Plyku's conversation with Kraya and as a result of Cpl. Michaels having had his own

10

conversation with Plaintiff, it further appeared that neither Plaintiff nor Kraya would allow Plyku to enter the property to retrieve her belongings, despite Cpl. Michaels informing Plaintiff that Plyku as a resident, had the right to enter her own residence in any manner that she deemed fit.  Cpl. Michaels and Trooper Gibson both testified that this was what they told both Plyku and Prifti – that since it was her home, they were not going to tell her to not go in to the property, that was up to her and that she could enter if she wanted to.

   Defendant Plyku and Prifti both testified that Prifti had a conversation with Cpl. Michaels about how to get into the house and that in the course of that conversation, Cpl. Michaels suggested that there might be something in the trunk of their cars that could be used to help them gain access to the house. Cpl. Michaels said that he suggested that if Plyku wanted to get into the house, the easiest way is to pry open a window. Subsequent to that, Prifti went into the trunk of his car, retrieved a tire iron and threw it through the sliding glass door, shattering the glass and that was how they gained entry. As all of the state troopers testified, shattering the sliding glass door was not what they had expected Prifti to do. Regardless, there is no evidence on this record that in so acting and in subsequently entering the property and helping Plyku to remove property from the residence, Prifti "exercised power

possessed by virtue of state law" or that his actions were made possible only because [he] was "clothed with the authority of the state." As we noted in our Memorandum and Order of February 26, 2018, none of the Pennsylvania state trooper defendants searched or seized any property from Plaintiff's home and thus we cannot find that Defendant Prifti was a "willful participant in joint activity with the State or its agents." Nor can we find that by referencing a tool normally kept in a car trunk and suggesting that he try to pry open a window, the state troopers coerced, controlled or significantly controlled Prifti's activities nor did they delegate to him a public function. Prifti at all times was and remained a private citizen acting at the request of and behest of another. He was not a state actor and he can not be held liable to Plaintiff under Section 1983.[3]

For these reasons, Defendant Prifti is entitled to the entry of judgment in his favor as a matter of law on Counts I and II of Plaintiff's Second Amended Complaint. An order follows.

---

[3] In light of our finding that Donald Prifti was not acting as a government agent or official, we need not reach the issue of his entitlement to qualified immunity.